UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                    CRIMINAL ACTION

VERSUS                                              NO. 24-99

SCHARMAINE LAWSON BAKER                    SECTION "R" (1)

## ORDER AND REASONS

Before the Court is defendant Scharmaine Lawson Baker's motion for acquittal or, in the alternative, a new trial.[1]  The government opposes the motion.[2]  The Court denies Baker's motion for the reasons below.

## I.    BACKGROUND

On April 25, 2024, the Government filed an indictment charging Scharmaine Lawson Baker with six counts of health care fraud, in violation of 18 U.S.C. §§ 1347 and 2.[3]  After a three-day trial, the jury returned its verdict, finding Baker guilty as to all counts.

Following her conviction, Baker moved for judgment of acquittal or alternatively a new trial.  Baker's motion asserts that the evidence presented at trial was insufficient to satisfy all of the elements of health care fraud for

---

[1]    R. Doc. 75.
[2]    R. Doc. 79.
[3]    R. Doc. 1.

1

the six counts of which she was convicted. Specifically, Baker contends that the government failed to present sufficient evidence that she acted with the requisite intent to commit health care fraud. Baker additionally argues that the government improperly solicited opinion testimony from Special Agent Gagliano. The government opposes Baker's motion. The Court considers the parties arguments below.

## II.    LEGAL STANDARD

### a. Motion for Judgment of Acquittal

Federal Rule of Criminal Procedure 29(a) provides that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c).

A motion for judgment of acquittal under Rule 29 challenges "the sufficiency of the evidence to sustain a conviction." *United States v. Uvalle-Patricio*, 478 F.3d 699, 701 (5th Cir. 2007). "When the defendant challenges the sufficiency of the evidence, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The same test applies whether the government's case depends on direct or entirely circumstantial evidence. *United States v. Thomas*, 627 F.3d 146, 151 (5th Cir. 2010) (citing *United States v. Clayton*, 506 F.3d 405, 412 (5th Cir. 2007)).

The court's job is to determine "whether the jury made a 'rational decision,' not 'whether the jury correctly determined guilt or innocence.'" *United States v. Zamora-Salazar*, 860 F.3d 826, 832 (5th Cir. 2017). The reviewing court does not weigh the evidence or make credibility determinations. *See id.* A review of the sufficiency of the evidence is "highly deferential" to the jury's verdict. *United States v. Isgar*, 739 F.3d 829, 835 (5th Cir. 2014). A verdict must be upheld "[i]f the jury was presented with sufficient evidence to support its verdict." *Zamora-Salazar*, 860 F.3d at 832.

### b. Motion for New Trial

Federal Rule of Criminal Procedure 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interests of justice so require.'" Fed. R. Crim. P. 33(a). "Any motion for a new trial grounded on any reason other than newly discovered evidence

must be filed within 14 days after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(2).

Rule 33 is exercised in two situations. *United States v. Crittenden*, 46 F.4th 292, 296 (5th Cir. 2022) (citing *United States v. Hoffman*, 901 F.3d 523, 552 (5th Cir. 2018)). One is "when error infects the trial." *Id.* (citing *Hoffman*, 901 F.3d at 552). "The other is when the court believes the evidence weighs 'heavily against the verdict.'" *Id.*

In determining whether the evidence weighs "heavily against the verdict," *Crittenden*, 46 F.4th at 296, the court may "weigh the evidence and may assess the credibility of the witnesses." *United States v. Ramos-Cardenas*, 524 F.3d 600, 605 (5th Cir. 2008). This differs from the Rule 29 context, where the court must view the evidence in the light most favorable to the prosecution. Nonetheless, "the judge cannot entirely usurp the jury's function and set aside the verdict merely because the court would have ruled the other way." *Crittenden*, 46 F.4th at 297.

Motions for new trial are disfavored. *United States v. McRae*, 795 F.3d 471, 478 (5th Cir. 2015); *see also United States v. Meyer*, 63 F.4th 1024, 1039 (5th Cir. 2023) (emphasizing that "[o]rdering a new trial is no small matter"). For a court to order a new trial, thereby disturbing a jury's verdict, "the

evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Meyer*, 63 F.4th at 1039.

### c. Elements of Health Care Fraud

To prove health care fraud in violation of 18 U.S.C. § 1347, the government must prove the following elements beyond a reasonable doubt: "the defendant knowingly and willfully executed, or attempted to execute, a scheme or artifice—(1) to defraud any health care benefit program or (2) to obtain, by means of false or fraudulent pretenses, representation, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services." *United States v. Willett*, 751 F.3d 335, 339 (5th Cir. 2014) (cleaned up).

## III.  ANALYSIS

### a. Evidence Presented at Trial

The government charged Baker with executing a scheme and artifice to defraud Medicare by submitting and causing to be submitted approximately $12.1 million in false and fraudulent claims to Medicare for medically unnecessary cancer genetic ("CGx") tests for which Medicare reimbursed approximately $1.5 million.[4]  During the trial the government presented

---

[4]    *See* R. Doc. 2.

voluminous evidence that Baker contracted with Bronson Medical, a purported telemedicine company, to write prescriptions for medically unnecessary CGx tests that were billed to Medicare and for which she was paid a fee for each prescription she wrote. The evidence included audio recordings of Baker's seconds-long "consultations," Baker's "patient notes," which were replete with errors and falsities, testimony from multiple witnesses including expert testimony, Baker's Medicare enrollment documents in which she agreed to abide by the Medicare Rules and Regulations, Baker's own books in which she held herself out to be knowledgeable on Medicare and telehealth, and evidence that Baker caused Medicare to be billed approximately $12 million for these tests.[5] An overview of the evidence follows.

The government called Andrew McCubbins, the former chief executive officer of Bronson Medical who testified that Bronson relied upon providers like Baker to write orders to bill to Medicare.[6] Take, for instance, the following exchange between the government and McCubbins:

> Q. Sure. Could you have signed the orders for those cancer genetic tests, Mr. McCubbins?
> A. No.
> Q. Could one of your employees at the call center have signed those orders?

---

[5]   *See generally* R. Docs. 80-83 (Trial Transcripts Days 1-3).
[6]   R. Doc. 80 (Trial Transcript Day 1) at 29, 37-38.

A. No.
Q. Did you need the provider in order to get orders signed for products such as cancer genetic testing?
A. Yes.
Q. Who required that providers sign those orders?
A. The insurance companies.
Q. Was Medicare included in that?
A. Yes.
Q. Would insurance companies pay for the service that were ordered by someone other than a medical provider?
A. No.[7]

The government also called Shauna Schwarm, a contractor with the Center for Medicare & Medicaid Services to investigate fraud, waste, and abuse, who testified regarding Medicare requirements and the "red flags" present in Baker's orders. Schwarm testified that Medicare requires services to be "medically necessary" to be reimbursable.[8] She further testified that providers must apply for a National Provider Identifier and fill out enrollment paperwork, which requires providers to make certain certifications in order to enroll with Medicare (a necessary predicate to billing Medicare).[9] Notably, she testified that a provider must "agree to abide by the rules and regulations of Medicare" in order to enroll.[10] The

---

[7]    *Id.* at 37-38.
[8]    R. Doc. 81 (Trial Transcript Day 2) at 17.
[9]    *Id.* at 17-18.
[10]   *Id.* at 18.

government additionally introduced Baker's signed enrollment application, which included a certification, which states:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to me. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the federal anti-kickback statute and the Stark law) and on my compliance with any applicable conditions of participation in Medicare.[11]

The jury also saw another certification within Baker's enrollment application, which certified that she would "not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."[12]

The government showed the jury relevant Medicare rules and regulations, which include that Medicare payments "may not be made for services that are not reasonable and necessary," and that clinical laboratory services "must be ordered and used promptly by the physician who is treating the beneficiary as described in 42 C.F.R. § 410.32(a) or a qualified nonphysician practitioner as described in 42 C.F.R. § 410.32(a)(3)."[13]   And

---

[11]   *Id.* at 21.
[12]   *Id.* at 23.
[13]   *Id.* at 30.

the jury heard from Schwarm regarding medical necessity of CGx tests, including that "if the patient doesn't have cancer and is not seeking treatment for that cancer, then [CGx testing] is not [medically] necessary," and thus Medicare would not pay for that testing.[14]

Schwarm further testified that $12,181,983 was billed to Medicare for CGx testing ordered by Baker, and that Medicare paid $1,500,271.21 on those orders.[15] Schwarm testified that there were 206 Medicare beneficiaries billed to Medicare for CGx testing ordered by Baker, and that a review of claims data showed that "[t]here were no kinds of services billed prior to the ordering of the testing," indicating that Baker had no pre-existing relationship with these Medicare beneficiaries.[16] When asked directly if "the only interaction that [Baker] had with th[e] patient[s] was ordering th[e] $34,000 test," Schwarm responded "yes."[17]

The government introduced additional evidence that Baker had no pre-existing relationship with the six beneficiaries identified in the Indictment, did not examine or treat them, and provided no follow-up after ordering the CGx testing.[18] The audio recordings of the 72, 39, 40, 44, 46, and 52-second

---

[14]    *Id.* at 34-35.
[15]    *Id.* at 55-56.
[16]    *Id.* at 56.
[17]    *Id.*
[18]    Government Exhibits 100-23; R. Doc. 81 at 3-13, 67-103.

"consultations" were played for the jury,[19] Baker's internal notes were displayed, and the jury saw that Baker billed the same 19 codes for each beneficiary.[20] The beneficiary or a health care provider for the beneficiary testified at trial confirming the lack of any pre-existing relationship with Baker and the lack of follow-up from Baker regarding the test results.[21] The jury additionally heard about the falsities within Baker's "patient notes."[22]

As an example, J.B., a 63 year old male, testified that the 39-second phone call with Baker was "pretty much" the entirety of his interaction with her.[23] The jury heard Baker ask how J.B. "how are you doing" and then immediately informed him that she'd like to get him "set up to receive a cancer screening kit in the mail" without asking any other questions.[24] J.B. also said he was unaware of any effort to contact him with the results of the test.[25] The jury saw Baker's "patient notes," which indicated that J.B. had a history of breast (including cancer in the areola of the left female breast),

---

[19]   Government Exhibits 102, 106, 110, 114, 118, 122.
[20]   Government Exhibits 100-123, 804-09.
[21]   *See, e.g.*, R. Doc. 81 at 72-76.
[22]   *See, e.g., id.*
[23]   *Id.*
[24]   Government Exhibit 106. This phone call was emblematic of the others the jury heard for the six beneficiaries named in the Indictment. Government Exhibits 102, 110, 114, 118, 122.
[25]   R. Doc. 81 at 72-76.

cervical, and pancreatic cancer,[26] which was false as J.B. testified that, at the time of the phone call with Baker, he did not have a personal history of those cancers.[27]   Significantly, Baker's entries for cancer in the areola of the left *female* breast and *cervical* cancer on a *male* were facially false.

The government's expert witness, Dr. Anthony Magliocco, testified at length about CGx testing generally and the CGx testing ordered by the defendant.   He opined that none of the CGx tests ordered by the defendant was medically necessary.[28]  He also testified that a provider who orders a CGx test for a patient should have an established relationship with that patient and should be responsible for the result of the test ordered.[29]   He further testified that there would be "no value" if a patient did not receive his or her results.[30]  He testified that CGx testing is not cancer screening and does not tell someone if they actively have cancer.[31]  Dr. Magliocco explained medical necessity in the context of CGx testing as follows:

> Q. For what categories of patients is cancer genetic testing medically necessary?
> A. Yes. It's medically necessary in a group of patients where it will impact care. Generally, that's the definition of medical necessity, that you need to know the information because you are going to

---

[26]   Government Exhibit 105.
[27]   R. Doc. 81 at 75-76.
[28]   *Id.* at 135-227.
[29]   *Id.* at 144-145.
[30]   *Id.* at 168.
[31]   *Id.* at 151-54.

change your care. So that means I'm going to do this test because I'm going to change the surgery that I do. I'm going to do this test because I'm going to change the frequency of the cancer screening . . . . Or I really need to know this information to select a new type of drug that only works if you have an inherited mutation in a gene called BRCA1. Those are instances of medical necessity, where you need that information to say I'm going to do this or that, this or that. And so that's where it becomes medically necessary and where a payer would say, yes, that's medically necessary, that's appropriate for this patient.[32]

He also explained that these tests are medically necessary for less than one percent of patients, and medically necessary for significantly under one percent of the Medicare population:

Q. What percentage of patients actually need cancer genetic testing?
A. It's actually -- if you are going to use that medical necessity, it's a fairly small number . . . . So I would estimate it's probably under one percent, significantly under one percent.
Q. What about the Medicare population, what percentage?
A. I think it would be very unlikely in that population. That's a population of above 65, more elderly people. They are already on standard care. In that population, you generally only use the test if you are going to be selecting them for a particular type of therapy. In that group, I would expect it to be a relatively smaller number. I think it would be under one percent. I don't know the exact number personally.[33]

Dr. Magliocco repeatedly testified that a provider could not decide to order a CGx test in the matter of seconds that Baker spent on the phone with the Medicare beneficiaries.  Further, he stated that his review of Baker's

---

[32]    *Id.* at 148-50.
[33]    *Id.*

Bronson patient files and associated CGx test orders revealed that files were formulaic, had consistent errors, lacked signed consent forms, and mislabeled the tests as cancer screenings.[34]

Dr. Magliocco also opined that all of Baker's CGx test orders that he reviewed were medically unnecessary:

> Q. We have reviewed the cancer genetic requisition forms, we have reviewed the audio recordings, we have reviewed the patient notes, and we reviewed the results for all six Medicare beneficiaries in the indictment. If that was all the information that you had on these six patients, would that be enough to make a determination whether to order a cancer genetic test?
> A. In my opinion, no. This is insufficient to make that determination.
> …
> Q. In addition to the patient files for the six Medicare beneficiaries that you reviewed, did you review any other files?
> A. Yes. I was provided with a substantial number of files.
> Q. How many would you say?
> A. I think it was over a hundred, maybe 109 or something in that range.
> Q. Did you review these files from March of 2019?
> A. Yes.
> Q. Have you ever ordered 100 cancer genetic tests in one week?
> A. No. No.
> Q. After reviewing these additional patient files, were any of the cancer genetic tests for those patients medically necessary?
> A. I went through as many as I could – many, many – and they were all very similar to the ones that we reviewed today.  In my opinion, I couldn't find even one that was medically necessary.
> Q. Final question: In your opinion, in all of the patient files that you have reviewed, was there a single one where cancer genetic testing was medically necessary?

---

34    *Id.* at 168-69.

A. There wasn't a single one that the evidence supported the necessity for cancer genetic testing.[35]

As discussed below, the government also introduced evidence that Baker attempted to conceal her involvement with Bronson. The evidence showed that in order to work for Bronson, Baker required a supervising physician, and that Baker entered into a collaborative agreement with Dr. Anil Prasad to satisfy that requirement.[36] The jury heard from Special Agent Gagliano that Baker did not file the collaborative agreement with Dr. Prasad with the Louisiana State Board of Nursing, while Baker filed other collaborative agreements during the same time period that she was providing "consultations" for Bronson.[37]

Special Agent Gagliano also testified that Baker failed to list her Bronson income in her 2019 bankruptcy filings. Specifically, she testified as follows:

> Q. Did you do any public record searches that revealed evidence related to her concealing her involvement in the Bronson scheme?
> A. Yes.
> Q. What did you find?
> A. A bankruptcy from 2019 where Bronson was not reported as an income source. Any time you file for bankruptcy, you have to list all your sources of income.
> ...

---

[35]   *Id.* at 224, 226-27.
[36]   Government Exhibit 403.
[37]   R. Doc. 82 at 94-96.

14

Q. Did you find anywhere in this filing about her income anything about the money she had received from Bronson?
A. No.
...
Q. So she files this amended version of her income. Does she include the Bronson payments in this amended filing of her income with the bankruptcy court?
A. Not on this page, if we can go to the second page. And not on the second page.
Q. So no mention of Bronson in the bankruptcy documents?
A. No.[38]

The jury also heard an audio recording in which Medicare beneficiary A.R. contacted Baker after her initial "consultation" to inform Baker that A.R. had spoken to Medicare and reported Baker for fraud.[39] The jury then saw Baker's email with Bronson asking that A.R.'s prescription not be filled under Baker's name.[40] The body of Baker's email stated:

I'm not sure if the staff communicated to you that a patient allegedly called Medicare on the company and me?? I had asked that her particular RX not be filled under my name. Did you get this message?[41]

Special Agent Erin Gagliano additionally testified that Baker made multiple false statements to the FBI. Take, for example, the following testimony:

Q. Can you give the jurors a general overview of how that interview went with the defendant.

---

[38]   *Id.* at 90-94.
[39]   *Id.* at 44-45; *see also* Government Exhibit 131.
[40]   *Id.* at 46-47.
[41]   Government Exhibit 409.

A. Yes. So we interviewed her inside of her house, and she told us that she had never worked for Bronson and that she didn't recall getting paid by Bronson. She said that she didn't order cancer genetic testing, and then at some point in the interview changed her statement and said she may have submitted an application for Bronson, but only worked there for a month or so.

...

Q. As a part of this line of questioning, did you ask the defendant about her experience with cancer genetic testing or with cancer patients generally?

A. Yes. She said that she didn't treat cancer patients and that she doesn't order cancer genetic testing.

...

Q. ... [D]id you confront the defendant about working for Bronson Medical?

A. Yes. Uh-huh.

Q. How did she respond?

A. She stated that she didn't work there and she never got paid by them. And then she stated that she may have submitted an application for them, but she only worked there for about a month or so.

Q. Did she talk about payments from Bronson at all during this interview?

A. Yeah. She said that she never got paid by Bronson.

Q. Based on your investigation, did you believe those statements to be truthful?

A. They were not truthful.

Q. What evidence did you have to the contrary?

A. We had bank records. We had records from Bronson Medical, including the contract, all of her onboarding documents, emails with the staff, direct deposit forms, the medical records themselves, the recordings.[42]

The government additionally introduced evidence that Baker held

herself out to be knowledgeable about Medicare requirements, telehealth

---

[42]    R. Doc. 82 at 31-34.

and billing.   Specifically, the jury saw portions of books authored by the defendant which covered those topics.[43]  For example, one book stated that a "service/visit must be medically reasonable and necessary."[44]   Special Agent Gagliano testified on the relevance of the books as follows:

> Q. How were the books useful to your investigation?
> A. Well, because it shows -- you know, the books that we are talking about deal with health care, and so some of them are for nurses who want to the start their own business. And so, in these books, there are statements about Medicare rules and regulations[,] so it shows her knowledge of those rules and regulations. There's also discussions about billing. Again, that shows her knowledge of that. And also with telemedicine, that shows her knowledge of telemedicine and how it's supposed to work.[45]

The government showed the chain of payments following the CGx test orders: first the lab running the CGx test submitted billing to Medicare; then Medicare reimbursed the lab which in turn sent money to Bronson which in turn disbursed a portion of the money to defendant.[46]

Finally,  on  cross-examination  Baker  herself  admitted  that  she "agree[d] [to] comply with the federal antikickback laws," "agreed … not [to] present false or fraudulent claims to Medicare," and "agree[d] to follow

---

[43]     Government Exhibits 500-03.
[44]     R. Doc. 82 at 70; *see also* Government Exhibit 500.
[45]     R. Doc. 82 at 66.
[46]     *Id.* at 27-28, 61-65.

[Medicare's] rules and regulations.[47]  She was also shown evidence indicating that she was being paid $20 per prescription written, not $20 per call regardless of the outcome.[48]   She admitted that she did not meet the Medicare beneficiaries in the indictment, did not bill for other services for them, she did not look at the results of any of the CGx tests she ordered, and never discussed the results with the beneficiaries.[49]   She further admitted that she does not order CGx tests for her actual patients.[50]  Indeed, the jury heard a recording of her telling a beneficiary that she would "usually send [her own patients] to a specialist."[51]

### b. Motion for Judgment of Acquittal

The government provided sufficient evidence such that the jury made a "rational decision." *Zamora-Salazar*, 860 F.3d at 832.  The government presented sufficient evidence for a rational jury to determine that the government established beyond a reasonable doubt that Baker knowingly and willfully committed six instances of health care fraud.  Between the government's twelve witnesses and voluminous exhibits, there was more

---

[47]    *Id.* at 151.
[48]    *See id.* at 143-50.
[49]    *Id.* at 153-58.
[50]    *See id.* at 161.
[51]    Government Exhibit 127.

than enough evidence to support the jury's verdict. The Court will not disturb the jury's rational decision.

As outlined in greater detail above, the jury saw and heard sufficient evidence from which they could reasonably conclude that Baker played a necessary part in the scheme to defraud Medicare and that Baker had the necessary knowledge and intent to be found guilty of Medicare fraud.

### i. Role in the Scheme

Andrew McCubbins, the former chief executive officer of Bronson Medical, testified that Baker and other providers were essential to the fraudulent scheme because they were necessary to order the CGx tests.[52] *Cf. United States v. May*, 131 F.4th 633, 639 (8th Cir. 2025) ("Because [the pharmacy] could not fill prescriptions without a medical provider's signature, an essential component of the scheme was medical providers willing to participate."). While defendant repeatedly argues that McCubbins testified that he, and he alone, was responsible for the scheme to defraud Medicare, she ignores critical testimony that belies that assertion. McCubbins testified that he could not have signed the CGx test orders

---

[52]    R. Doc. 80 at 29, 37-38.

himself, that he relied on providers like the defendant to sign the orders, and otherwise Medicare would not pay for the tests.[53]

### ii. Knowledge and Intent

The jury heard and saw copious evidence from which it could conclude that Baker knowingly and with the requisite intent defrauded Medicare. The jury heard audio recordings of Baker's "consultations" with Medicare beneficiaries, the result of which were CGx test orders.[54] The jury heard the exceedingly brief, formulaic calls in which Baker elicited no information from the patients but told them only she would send them a test kit and provided instructions on how to complete the cheek swab and return the kit.[55] In one instance Baker did not even speak to the beneficiary for whom she ordered the CGx test.[56] They also saw the resulting notes and diagnosis codes that Baker entered in connection with the orders, which included false information.[57] They saw evidence that Baker entered into a collaborative agreement with Dr. Prasad for him to be her supervising physician, and that she never met Dr. Prasad, much less was supervised by him. Furthermore, the government called an expert witness, Dr. Anthony Magliocco, to walk the

---

[53]    *Id.* at 37-38.
[54]    Government Exhibits 102, 106, 110, 114, 118, 122.
[55]    Government Exhibits 102, 106, 110, 114, 118, 122.
[56]    Government Exhibit 102.
[57]    Government Exhibits 100-03, 104-06, 108-10, 112-14, 116-18, 120-22.

jury through cancer genetic testing and the orders that Baker authorized. As outlined in greater detail above, Dr. Magliocco testified that Baker (1) ordered the CGx tests without being the treating physician for the Medicare beneficiaries; (2) failed to obtain informed consent from the Medicare beneficiaries before ordering the tests; (3) did not properly document the medical records to support the CGx testing orders; (4) did not follow up with the beneficiaries about the results of the CGx tests; and (5) did not review or deliver the results of the CGx tests to the beneficiaries.[58] Dr. Magliocco testified that medical necessity for CGx testing could not be determined in a matter of seconds.[59] Dr. Magliocco additionally testified that in his opinion, none of the over 100 CGx tests ordered by Baker that he reviewed was medically necessary.[60]

The government additionally introduced evidence that Baker knew what medical necessity meant, was familiar with telemedicine, billing, and rules and regulations governing Medicare. Specifically, the jury saw Baker's Medicare enrollment documents and the attestations that she made to enroll, and portions of books authored by Baker in which Baker demonstrated she

---

[58]   R. Doc. 81 at 135-227.
[59]   *Id.*
[60]   *Id.*

was knowledgeable about the requirement of medical necessity.[61] And on cross-examination Baker testified that she agreed to follow the laws, rules, regulations, and program instructions governing Medicare.[62] Baker even admitted that she told a patient that she would not order these tests for her own patients.[63] And the jury heard an audio recording in which Baker told a caller that she would send her own patients out to a specialist for CGx testing.[64]

The jury also heard and saw evidence that supports the reasonable conclusion that Baker actively concealed her involvement with Bronson. The government showed that Baker failed to notify the Louisiana State Board of Nursing of her collaborative agreement with Dr. Anil Prasad (the Doctor who purportedly supervised her Bronson work), despite notifying the Louisiana State Board of Nursing of other collaborative agreements during the same time period.[65] The government also showed that after a patient told her that she had reported Baker to Medicare for fraud, Baker told Bronson to take her name off of the prescription for that patient.[66] And Special Agent Gagliano

---

[61] Government Exhibits 300, 304-06, 500-03.
[62] R. Doc. 82 at 150-52.
[63] *Id.* at 160-61.
[64] Government Exhibit 127.
[65] Government Exhibits 403, 700-03; R. Doc. 82 at 93-96.
[66] Government Exhibits 131, 133, 409.

testified as to the false statements Baker made to law enforcement when interviewed, including denying that she ever worked for Bronson or was paid by Bronson.[67]

Special Agent Gagliano[68] also testified as to the flow of money from Medicare following the orders of the CGx testing.  Specifically, Special Agent Gagliano testified as follows: the lab running the CGx tests submitted the bills to Medicare; said lab required a signed order from an ordering provider; Medicare reimbursed the lab for the testing; and the reimbursements from Medicare were then further dispersed to Bronson and from there to Baker and other ordering providers.[69]

Taken together, the government presented sufficient evidence that, aware of the laws, rules, and regulations that govern Medicare, Baker ordered hundreds of costly, medically unnecessary CGx tests based on erroneous and false information and following extraordinarily brief and formulaic encounters with Medicare beneficiaries concerning whom she had no history, asked no questions and provided no follow-up.  The government's evidence also showed that in order to write prescriptions for Bronson, Baker

---

[67]   R. Doc. 82 at 31-34.

[68]   The Court notes that defendant brings forth a new objection to Special Agent Gagliano's testimony in the present motion.  The Court addresses this objection in section III.a.iv.

[69]   R. Doc. 82 at 27-28, 61-65.

needed a supervising physician, and she signed an agreement with a doctor whom she never met, much less consulted with. And the government presented evidence that Baker attempted to conceal her involvement with Bronson. This evidence was certainly sufficient for a reasonable jury to conclude that Baker acted with the requisite knowledge and intent.

Baker attempts to argue ignorance to counter this rational finding. The government presented sufficient evidence for a rational juror to conclude that Baker was not in fact "ignorant," and the Fifth Circuit has already rejected similar arguments of ignorance. *See e.g., United States v. Umawa Oke Imo*, 739 F.3d 226, 237 (5th Cir. 2014) (rejecting defendant-anesthesiologist's argument that she was unaware of the health care fraud scheme being run through a clinic where sufficient evidence showed that false claims to Medicare and Medicaid were submitted under her billing number and the services were not rendered to the patients); *United States v. Whitfield*, 485 F. App'x 667, 670-72 (5th Cir. 2012) (rejecting defendant-physician's claim of ignorance of a Medicare fraud scheme where sufficient evidence demonstrated that she had knowledge of Medicare requirements and medical necessity, and had educational background and experience in the healthcare industry). Purported ignorance provides no shield here.

24

In her motion, defendant heavily relies upon *United States v. Nora*, 988 F.3d 823 (5th Cir. 2021), a case in which the Fifth Circuit reversed the conviction of a home health agency's office manager who was tried alongside five co-defendants for his involvement in a health care fraud and kickback scheme. But *Nora* does not help defendant. In *Nora*, the Fifth Circuit found the government's evidence insufficient to show that Nora, the office manager who joined the home health agency "at age 22 with a high school degree," acted "willfully." *See id.* But, in *United States v. Barnes*, 979 F.3d 283 (5th Cir. 2020), the Fifth Circuit affirmed the convictions of Nora's co-defendants: four physicians who referred patients to the home health agency and the biller of the home health agency who would process Medicare filings. Baker's argument falls apart when considering the factual distinctions between *Nora*, and her own case, and the similarities between Baker and the defendants in *Barnes.* Baker was a nurse practitioner, not an office manager like *Nora*. Her role, which included signing prescriptions for medically unnecessary CGx testing, is substantially more akin to the role of the physician defendant Shelton Barnes, who signed home healthcare certificates for Medicare beneficiaries whom he had not met and was not treating and who were ineligible for the care. *Barnes*, 979 F.3d at 297. The government's evidence showed that Baker herself enrolled with Medicare;

25

that her Medicare enrollment required that she agree to rules, regulations, and laws governing Medicare, including compliance with the Federal Anti-Kickback statute; and that she, and other providers who could bill Medicare, were necessary for the scheme. The government provided ample evidence that Baker was ordering the CGx tests like the physicians in *Barnes*, not merely collecting information or fielding calls as in *Nora*. Baker could not be easily substituted as an office manager might. As McCubbins testified, providers like Baker were needed to sign the prescriptions. She could not be substituted out by an office manager. Despite Baker's attempts to minimize her role, the government offered ample evidence to establish that Baker was essential to the scheme and had the requisite knowledge to have committed health care fraud. *Nora* is simply inapposite.

Baker's attack on the verdict on the basis that the government relied on circumstantial evidence is likewise meritless. This argument finds no footholds in the law. "Jurors are allowed to infer knowledge and intent from conduct or context." *United States v. Martinez*, 921 F.3d 452, 479 (5th Cir. 2019). Indeed, the Fifth Circuit has recognized that "[i]ntent to defraud is typically proven with circumstantial evidence and inferences." *United States v. Patel*, 485 F. App'x 702, 708 (5th Cir. 2012). The voluminious evidence described in detail in this order was sufficient for a reasonable juror to

26

conclude that Baker had the requisite knowledge and intent to commit healthcare fraud as charged in the six counts of the Indictment.

### iii. Kickbacks

Baker additionally argues that the government failed to present sufficient evidence of kickbacks. This too is countered by the record. The jury saw the agreement between Baker and Bronson Medical in which she was to be "paid $20.00 per network based consultation," but was actually paid per prescription ordered.[70] The jury heard the incredibly brief "consultations" themselves and heard from expert witness Dr. Magliocco who opined that a provider could not have assessed the appropriateness of a CGx test order in such periods of time.[71] And the jury saw evidence that Baker did not disclose the Bronson income during her 2019 bankruptcy filing. This evidence is more than sufficient for a reasonable juror to determine that Baker was not actually performing "consultations" and was instead receiving kickbacks for her role in ordering the medically unnecessary CGx tests. *Cf. May*, 131 F.4th at 644 (finding that a "reasonable jury could have found [defendant] guilty beyond a reasonable doubt of receiving kickbacks" when a witness testified that he paid defendant to sign

---

[70]    Government Exhibit 400; R. Doc. 82 at 142-44.
[71]    *E.g.*, R. Doc. 81 at 217-18.

prescriptions and there was corroboration of the payment through bank records).

Baker's argument revolving around the definition of "kickbacks" fails too.  First, as the government rightly points out, a Rule 29 motion is not an opportunity to present a waived challenge.  *Cf. United States v. Hope*, 487 F.3d 224, 227 (5th Cir. 2007) ("The only proper basis for a motion for judgment of acquittal is a challenge to the sufficiency of the government's evidence.").  Even if Baker's argument were appropriate here, it is wrong. Courts may decline to adopt rigid definitions of "kickbacks." *See, e.g., United States v. Charroux*, 3 F.3d 827, 834-35 (5th Cir. 1993) (holding that a district court did not abuse its discretion by permitting testimony on "kickbacks" without adopting the defendant's narrow proposed definition).  Thus, even had Baker timely objected to the term or asked the Court to use her proposed definition during trial, the Court need not have accepted her narrow, preferred definition.  Moreover, the government's charges here were not based on a novel conception of "kickbacks."  Accordingly, the jury did not need to be provided a specific definition as the term "has a common meaning that [is] readily understood by the jury." *United States v. Gonzalez*, 834 F.3d 1206, 1225 (11th Cir. 2016).

In sum, the government presented enough evidence for a reasonable jury to conclude that Baker was receiving kickbacks, the jury could have readily understood "kickback" as the government used the term without being provided a specific definition, and even had a definition been needed, the Court need not have adopted a narrow one as defendant argues.

####  iv.  *Rule 704(b)*

Despite failing to object to Special Agent Gagliano's testimony at trial,[72] Baker now argues that Gagliano's testimony violated Federal Rule of Evidence 704(b) because she provided opinion testimony regarding defendant's intent.  Pretermitting discussion of the inaccuracy of defendant's recollection of Special Agent Gagliano's testimony, the Court addresses the inapplicability of Rule 704(b).

Federal Rule of Evidence 704(b) is an exception to the general rule provided in 704(a).  Federal Rule of Evidence 704 provides that:

> (a) In General—Not Automatically Objectionable.  An opinion is not objectionable just because it embraces an ultimate issue.
> (b) Exception.  In a criminal case, an *expert witness* must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense.  Those matters are for the trier of fact alone.

---

[72]    R. Doc. 82 at 22-96, 108-11.

Fed. R. Evid. 704 (emphasis added).  Critically, Baker ignores the simple fact that Special Agent Gagliano was not an expert witness and that 704(b) is an exception to 704(a), which states clearly that "[a]n opinion is not objectionable just because it embraces an ultimate issue."  *Id.*  On these simple grounds, the Court rejects defendant's argument that this alleged "error" furnishes a reason for acquittal.  *See United States v. Espino-Rangel*, 242 F. App'x 219, 220 (explaining that Rule 704(b) "has no application" when the witness was not called as an expert); *United States v. Thomas*, 294 F. App'x 124, 133 ("As [witness] was not tendered as an expert, the strictures of Rule 704(b) are inapplicable."); *see also United States v. Diaz*, 637 F.3d 592, 599 (5th Cir. 2011) (a lay witness "may give opinion testimony about a defendant's mental state"); *United States v. Keys*, 747 F. App'x 198, 207 (5th Cir. 2018) (a lay witness may give an "explanation of the [witness's] analysis of facts which would tend to support a jury finding on the ultimate issue").

Special Agent Gagliano, as a lay witness, was allowed to express an opinion on an ultimate issue such as Baker's mental state.  *See Keys*, 747 F. App'x at 207.  Special Agent Gagliano's testimony, which this Court again notes went un-objected to during trial, was permissible.

Moreover, even if allowing the testimony were error, the error would be harmless.  In the context of permitting testimony, error is "harmless if

there is sufficient evidence, aside from any potentially impermissible testimony, from which the jury could find the Defendant[] guilty." *Espino-Rangel*, 242 F. App'x at 220 (citing *United States v. Gutierrez-Farias*, 294 F.3d 657, 663-64 (5th Cir. 2002)).  As outlined in detail above, the government presented voluminous evidence from which a reasonable jury could conclude that Baker committed health care fraud.  The government's case did not stand or fall on Special Agent Gagliano's testimony.  Accordingly, even if it were error (it was not) to have allowed Special Agent Gagliano to testify as she had, such error would be harmless.

### c. Motion for New Trial

Here, error has not "infected the trial," the evidence does not "heavily" weigh against the verdict, and no miscarriage of justice has occurred. *Crittenden*, 46 F.4th at 296.  In her motion Baker does not provide separate arguments for acquittal and new trial.  Instead, she states that in the event that this Court does not grant her request for acquittal, it should order a new trial.  As explained above, the government's evidence is sufficient to sustain the conviction.  Even weighing the evidence and assessing the credibility itself, the Court is satisfied that the government provided sufficient evidence for the reasons explained in the preceding section.  And, as explained above, Baker has pointed to no error that has resulted in the miscarriage of justice.

This is not an extraordinary case, and no extraordinary remedy is warranted.  Heeding the Fifth Circuit's warning that motions for new trial are disfavored, *McRae*, 795 F.3d at 478, and should be granted only with "great caution," *United States v. O'Keefe*, 128 F.3d 885, 898 (5th Cir. 1997), the Court denies Baker's motion for a new trial.

## IV.    CONCLUSION

For the foregoing reasons, the Court DENIES Baker's motion for judgment of acquittal and alternatively a new trial.

New Orleans, Louisiana, this __24th__ day of March, 2026.

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE